UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF NEW YORK

_____

WILLIAM C. COLEMAN,

                                        Petitioner,

              v.                                                9:03-CV-1176
                                                                (LEK/GJD)
WILLIAM PHILLIPS, Superintendent,

                                        Respondent.

_____

WILLIAM C. COLEMAN, Petitioner pro se
MICHAEL G. McCARTIN, Asst. Attorney General

GUSTAVE J. DI BIANCO, U.S. Magistrate Judge

## REPORT-RECOMMENDATION

     This matter has been referred to me for Report and Recommendation by the

Honorable Lawrence E. Kahn, United States District Judge, pursuant to 28 U.S.C.

§ 636(b) and Local Rules N.D.N.Y. 72.3(c).

     Petitioner brings this action for a writ of habeas corpus pursuant to 28 U.S.C.

§ 2254, challenging a judgment of conviction from the Schenectady County Court.

On August 19, 1999, petitioner was convicted of two counts of Murder, First Degree,

and one count each of Attempted Murder, First Degree and Reckless Endangerment,

First Degree.  Petitioner was sentenced to an indeterminate term of incarceration

consisting of two consecutive life terms without parole on the murder convictions, and

additional consecutive terms of twenty-five years to life on the attempted murder

conviction, and two and one-third to seven years on the reckless endangerment

conviction.

The Appellate Division, Third Department affirmed the conviction on July 25, 2002. *People v. Coleman*, 296 A.D.2d 766, 745 N.Y.S.2d 320 (3d Dep't 2002).  The New York Court of Appeals denied leave to appeal on November 26, 2002.  *People v. Coleman*, 99 N.Y.2d 534, 782 N.E.2d 594, 752 N.Y.S.2d 594 (2002).

Petitioner raises the following grounds in support of his petition.

1.  The conviction was obtained by the use of "coerced confessions/testimonies from various witnesses . . . ." (Dkt. No. 1, ¶ 12(A).

2.  Petitioner was denied the effective assistance of counsel.

3.  Petitioner was denied the right to appeal.

Respondent has filed an answer and memorandum of law, together with the pertinent state court records.[1] (Dkt. No. 7).  For the following reasons, this court will recommend denial of the petition.

## DISCUSSION

### 1.  <u>Facts</u>

On October 19, 1998, Carol Dumont and William Coleman, Jr. were shot and killed in their home in Schenectady, New York.  Petitioner was married to Carol Dumont, and William Coleman, Jr. was petitioner's son.  At the time of the shooting, Carol Dumont and William Coleman, Jr. had recently moved out of 1260 Main Street, where they had lived with petitioner, and had moved into the apartment next door at 1262 Main Street. (Trial Transcript (T) 1351-52).  Jennifer Darling, a friend of Diana

---

[1] The state court records are listed on pages 2 and 3 of respondent's Answer. (Dkt. No. 7).

Dumont,[2] had moved to Schenectady and was staying at 1260 Main Street with petitioner and Daniel Ortiz. (T. 1354).

Jennifer Darling testified at trial. She testified that on the morning of the shooting, she observed marks on Carol Dumont's neck that ". . . looked like fingerprints, thumbprint." (T. 1364). Ms. Darling stated that petitioner had been drinking and was angry that day, that at various times during the day he had argued with Carol Dumont and William Coleman, Jr., and had even called Ms. Darling names. (T. 1365-69). Later in the afternoon, Ms. Darling helped Carol Dumont and William Coleman, Jr. install new locks on the doors to 1262 Main Street. (T. 1368-69). When Ms. Darling returned to the apartment she shared with petitioner, she saw petitioner sitting on the couch. (T. 1370). She stated that she went into the kitchen, and Daniel Ortiz told Darling to "call Carol next door and tell her that Bill had loaded the gun." (T. 1371). Ms. Darling made the telephone call, and then went back to Carol Dumont's apartment to borrow a pot. (T. 1372-74).

Ms. Darling testified that as she was preparing to return home, she saw petitioner enter Carol Dumont's apartment through the front door with a gun, and begin shooting. (T. 1374). She stated that she saw petitioner fire several shots at William Coleman, Jr., who was sitting on a recliner in the livingroom. (T. 1374-75). Ms. Darling stated that she heard William Coleman, Jr. say, "Dad, Dad, what are you doing?" (T. 1375). At that point, Ms. Darling and Ms. Dumont attempted to run away from petitioner. (T. 1377).

---

[2] Diana Dumont was a relative of Carol Dumont. (T. 1352).

Ms. Darling and Ms. Dumont ran down the hallway, screaming, but Ms. Darling managed to run into the bathroom. *Id.* Ms. Darling stated that the bathroom door would not close, so she braced the door with her body. (T. 1378). While she was in the bathroom, she heard more gunshots. (T. 1377). She also heard banging on the bathroom door. *Id.* Ms. Darling testified that at some point, she realized that Ms. Dumont had stopped screaming, and she heard petitioner come back to the bathroom door. *Id.* Petitioner fired a gunshot through the door and attempted to force the door open. *Id.* Ms. Darling stated that she felt some pain in her hip, but at the time, she thought that she had hit her hip on the wall. (T. 1380).

Ms. Darling then heard something drop outside the bathroom door. (T. 1381). She then heard the "Holloween decoration at the front door." (T. 1381). Ms. Darling testified that there was a motion-sensitive Halloween witch hanging on the front door that would emit a loud "cackling laugh" when someone walked by it. *Id.* She stated that when she heard that noise, she knew that someone had passed by the door and assumed that petitioner had left the house. *Id.*

Ms. Darling stated that the house seemed very quiet, and that she then opened the bathroom door. (T. 1382). As she opened the door, she saw the gun lying on the floor outside of the bathroom. (T. 1381-82). As she walked out of the bathroom, she heard the telephone ringing and answered it. (T. 1382). Daniel Ortiz was on the telephone, and Ms. Darling told him what had just happened. (T. 1382). Ortiz told Darling to call 911. (T. 1382). Ms. Darling testified that she hung up the telephone and went to check on Ms. Dumont and William Coleman, Jr. (T. 1382-83). She

4

realized that they were both dead. (T. 1383). She went into the spare bedroom to call 911. (T. 1383).

Ms. Darling next heard knocking at the door, looked out the window to see that it was Daniel Ortiz, and let him into Dumont's apartment. (T. 1383). Ms. Darling stated that she remembered Daniel Ortiz coming into the house and moving the gun from the hallway to underneath the bed in Carol Dumont's bedroom. (T. 1384). When the police arrived, Ms. Darling and Mr. Ortiz left 1262 Main Street and stood behind a police car while they waited for petitioner to come out of his apartment. (T. 1384). Ms. Darling was treated for a gunshot wound to her hip. (T. 638-39).

Daniel Ortiz testified that petitioner had argued with Carol Dumont earlier in the day. (t. 1252). Ortiz also stated that he saw Jennifer Darling changing the locks on the doors of 1262 Main Street. (T. 1253). Ortiz stated that petitioner had been drinking during the day, and that Ortiz had seen petitioner "playing with" and loading one of the guns that petitioner kept in the house. (T. 1255-57). Ortiz testified that he told Jennifer Darling that petitioner had loaded the gun, so Ms. Darling called Carol Dumont to let her know. (T. 1259). Ms. Darling then went back to Dumont's apartment to borrow a pot. *Id.*

Mr. Ortiz testified that a few minutes later, he heard the gunshots. (T. 1260). Ortiz stated that he looked for petitioner, and when Ortiz did not find petitioner in the apartment, he telephoned 1262 Main Street. *Id.* He stated that Jennifer Darling answered the telephone, told Ortiz what had happened, and Ortiz told Darling to call 911. (T. 1260). Ortiz also began dialing 911, but as he was dialing, he heard the front

5

door slam, and went out to see if someone had entered the apartment. (T. 1261).

Daniel Ortiz saw petitioner and asked him "oh my god, Bill, what did you do?" *Id.*

Ortiz testified that petitioner responded, "I killed her," and then stated, "I killed them."

*Id.*  Mr. Ortiz then ran out the door and went over to knock on the door of 1262 Main

Street. (T. 1262).  Ms. Darling eventually let Ortiz into the apartment, and Ortiz

testified that he put the gun under Dumont's bed because he did not know if there

were any bullets left in the gun, and he was worried that petitioner might come back

for the gun and try to shoot him or Ms. Darling. (T. 1263).  Ortiz then called 911. (T.

1263).  When the police arrived, Ortiz and Darling went out to meet them and were

told to "duck down" by the police car. (T. 1264).

After the police arrived, a man stepped out onto the porch of 1260 Main Street.

(T. 479, 524, 570).  Jennifer Darling, Daniel Ortiz, and another man were standing

with Police Officer Anthony DiCarlo, and when they saw the man step onto the porch,

they said, "[t]hat's him, that's Bill Coleman on the porch . . . ." (T. 570).  Petitioner

was taken into custody without incident. (T. 480-81, 524-25).

The officers then entered 1262 Main Street and determined that Carol Dumont

and William Coleman, Jr. were both dead. (T. 527-30, 576-77).  Dr. Barbara Wolf, a

forensic pathologist testified that she performed autopsies the day after the shooting.

(T. 748).  Dr. Wolf determined that the cause of Carol Dumont's death was a gunshot

that entered the back of her neck and exited through her mouth. (T. 753-55).  Dr. Wolf

found that William Coleman, Jr.'s cause of death was two gunshot wounds, one from a

bullet that entered his right forehead, and the second that severed the femoral vein in

his right thigh. (T. 758-63).

At trial, two Lowell, Massachusetts police officers testified regarding a 1993 incident involving Carol Dumont and petitioner. (T. 663-77, 678-91). During that incident, Carol Dumont had been punched, and petitioner was arrested for domestic assault and battery. (T. 666, 672, 681). Several witnesses testified that Carol Dumont and petitioner had a volatile relationship, with periods of relative calm, but frequently marked by alcohol-fueled, physically violent arguments. (T. 1230-33, 1355-59, 783-809). The arresting police officers testified that the petitioner did not appear drunk at the time of his arrest, but Officer DiCarlo testified that five hours later, he noticed the strong smell of alcohol and thought that petitioner might have been intoxicated. (t. 496, 519-20, 616). A firearms examiner testified at trial that the gun recovered from under Carol Dumont's bed was "consistent with," but not identifiable as the gun used in the shooting. (T. 714). Petitioner was found guilty after a nine-day trial. (T. 1599-1601).

Petitioner was assigned counsel to conduct his direct appeal. (State Court Records (SCR),Volume 2). Petitioner made a motion for permission to file a *pro se* supplemental brief on appeal in the Third Department. (S.C.R. 5-6). He also requested his own copy of the trial transcripts. *Id.* The court granted petitioner's motion to file the supplemental brief, but denied his request for a separate, complete copy of the trial transcripts. (S.C.R. 9). Attorney Marcel Lajoy was originally appointed to represent petitioner on appeal. Attorney Lajoy filed one brief on petitioner's behalf which appears in the record. However, on February 23, 2001, the Third Department granted

Attorney Lajoy's application to be relieved of the assignment to represent petitioner and appointed Jerald Rosenthal, Esq. (S.C.R. 8).  A complete copy of the transcripts was sent to Attorney Rosenthal by the Chief Assistant District Attorney. (S.C.R. 10).

The Third Department advised petitioner that he could still submit a supplemental *pro se* brief if he desired to do so. (S.C.R. 16).  The court also notes that the record contains a letter from Attorney Rosenthal to the Third Department requesting an additional extension of time because Attorney Rosenthal had sent a draft of his brief to petitioner and was awaiting petitioner's reply. (S.C.R. 14).  The court granted petitioner two extensions of time so that he could file a *pro se* brief, but denied him the additional transcripts. (S.C.R. 17-18).  Petitioner wrote to the court, stating that he would be unable to file a Supplemental Brief because neither the court nor appellate counsel had furnished petitioner with the trial transcripts. (S.C.R. 19).  The Appellate Division affirmed the conviction, and the New York Court of Appeals denied leave to appeal. *People v. Coleman*, 296 A.D.2d 766, 745 N.Y.S.2d 320 (3d Dep't 2002), *lv. to appeal denied*, 99 N.Y.2d 534, 782 N.E.2d 594, 752 N.Y.S.2d 594 (2002).

## 2.   **Exhaustion**

The law is well-established that prior to bringing an petition for habeas corpus pursuant to 28 U.S.C. § 2254, a petitioner must exhaust his state court remedies with respect to each claim presented in his federal application for habeas relief. *Baldwin v. Reese*, 541 U.S. 27, 29 (2004).  The petitioner must "fairly present" his claims in each appropriate state court, alerting the court to the ***federal nature*** of the claims. *Baldwin*,

541 U.S. at 29 (quoting *Duncan v. Henry*, 513 U.S. 364, 365-66 (1995)).  The

petitioner must have informed the state court of **both** the factual **and** the legal

premises of the claims that he is attempting to bring in federal court. *Id.*

      As the Second Circuit has held, in order for a petitioner to "invoke one

complete round of the State's established appellate review process," he must first

appeal his conviction to the Appellate Division and then must seek further review of

the conviction by applying for leave to appeal to the New York Court of Appeals.

*Smith v. Duncan*, 411 F.3d 340, 345 (2d cir. 2005)(quoting *Galdamez v. Keane*, 394

F.3d 68, 74 (2d Cir. 2005)).  Applicants for leave to appeal must submit briefs and

other documents to the Court of Appeals, identifying the issues upon which the

application is based, and must focus upon identifying problems of reviewability and

preservation of error. *Smith v. Duncan*, 411 F.3d at 345.  In *Grey v. Hoke*, 933 F.2d

117, 120 (2d Cir. 1991), the Second Circuit stated that it would undermine the

principles of comity to consider a constitutional claim as to which no ruling was

requested from the state court.

      In this case, respondent argues that petitioner failed to exhaust all of his claims.

Petitioner raised eight claims in his appeal to the Appellate Division.  In fact,

plaintiff's originally assigned attorney filed a brief, and his second attorney also filed

a brief. (*See* Appellant's Brief and Supplemental Brief).  Thus, two attorneys filed

briefs for petitioner in this case.  None of the eight claims included any allegation

regarding "coerced confessions/testimonies," nor did petitioner ever raise a claim that

he was being denied his right to appeal.  Because petitioner has failed to raise these

9

two claims in ***any state court***, he has failed to exhaust two of the three claims that he

brings in this application.  The court must now turn to an analysis of the failure to

exhaust.

### A.  Coerced Confession (Claim 1)

After the court determines that a claim is unexhausted, the court must also

determine whether petitioner has any "available procedures" to raise the issue in state

court.  If some of petitioner's claims are not exhausted and others are exhausted, but

petitioner has "available remedies" in state court to address the unexhausted claims,

the court may dismiss the petition in its entirety so that petitioner may return to state

court to exhaust his remedies. *See Saracina v. Artus*, 04-CV-521, 2007 U.S. Dist.

LEXIS 71639, *27-29 (W.D.N.Y. Sept. 26, 2007).

In this case, petitioner's first claim is that his conviction was obtained by the

use of "coerced confessions/testimonies from various witnesses." (Dkt. No. 1, ¶

12(A)).  Petitioner does not claim that ***he*** was subject to any coercion.  He merely

states that one witness who was at the crime scene picked up the murder weapon,

"wiped it clean", and threw it under a bed. *Id.*  However, petitioner does not state how

any testimony from this witness was "coerced."  Petitioner also uses the term "various

witnesses" without specifying any factual or legal basis for his claim.

It is clear that petitioner has never raised the issue of the "coerced" confessions

or testimony in any state court, and thus, the claim is unexhausted.  The question then

is whether there are any available state court remedies for exhausting this issue.

Although it is unclear, it would appear to the court that if petitioner were claiming that

10

some of the prosecution's witnesses were "coerced" into testifying in a particular

manner, the factual basis of this claim would ***not*** be "on the record."[3]   The vehicle, if

any, to bring such a claim would be a motion to vacate the judgment under N.Y. CRIM.

PROC. LAW § 440.10.  Since a motion to vacate the judgment may be brought "at any

time" after the entry of the judgment, petitioner could conceivably go back to state

court to raise this claim.  Thus, petitioner could have an "available" method of

exhaustion.  However, a review of the claim shows that the court should not dismiss

the petition so that petitioner can return to exhaust his first claim.

   After the enactment of the AEDPA, the court has another option when dealing

with petitions containing exhausted and unexhausted claims.  Pursuant to 28 U.S.C.

§ 2254(b)(2), an "application for a writ of habeas corpus may be denied on the merits,

notwithstanding the failure of the applicant to exhaust the remedies available in the

courts of the State."  The Second Circuit has held that a court has the discretion to

***deny*** the habeas petition in its entirety on the merits, notwithstanding the failure to

exhaust all of the claims contained in the application. *Pratt v. Greiner*, 306 F.3d 1190,

1196-97 (2002).

   The Second Circuit has not established a standard for when unexhausted claims

should be denied on the merits under section 2254(b)(2), but the majority of district

courts in the Second Circuit use a "patently frivolous" test for dismissing unexhausted

---

[3] If the basis for the claim does not appear on the record, it would be inappropriate for a direct appeal. *See People v. Garcia*, 13 A.D.2d 818, 820 785 N.Y.S.2d 803, 805 (3d Dep't 2004) (discussing the fact that if the statement upon which a direct appeal is based is not on the record, the claim should have been raised in a section 440.10 motion to vacate the conviction).

claims. *Lewis v. Bennett*, 328 F. Supp. 2d 396, 405-406 (W.D.N.Y. 2004)(citing cases). Other district courts in the Second Circuit have used a "nonmeritorious" standard to address unexhausted claims. *Id.* at 406. This test has been expressed as whether it is "'perfectly clear that the [petitioner] does not raise even a colorable federal claim,' in which case the Court should dismiss the unexhausted claim on the merits (or rather the clear lack thereof)." *Id.* (internal quotation marks omitted and citation omitted).

In this case, the court will exercise its discretion to recommend dismissing this unexhausted claim ***on the merits***. Petitioner's first claim fails under either standard for dismissal stated above. Petitioner did not submit a memorandum of law in support of his first claim, and the petition contains only one short paragraph containing a conclusory statement that the conviction was obtained by the "use of coerced confession(s)." In the next paragraph of his claim, petitioner states that the "only" evidence against petitioner was "coerced confessions/testimonies from ***various witnesses***." (Dkt. No. 1 at ¶ 12(A)(emphasis added). Petitioner then states that

> One witness happen [sic] to be at the crime scene when it occurred, supposedly she (the witness) picked up the murder weapon, wiped it clean and threw it under a bed.

*Id.*

As stated above, there is no factual basis for a claim that any witness or witnesses were coerced or even that they testified falsely. The brief statement, quoted

above, that petitioner makes regarding Ms. Darling[4] placing the gun under the bed does not show how petitioner's constitutional rights would have been violated by this testimony. In any event, petitioner has misstated the testimony. Daniel Ortiz testified that *he* picked up the gun and put it under Carol Dumont's bed. (T. 1263). Mr. Ortiz had a logical explanation for doing so. He testified that he did not know whether the gun had any bullets left in it and whether the petitioner was going to come back and try to shoot Ortiz and Darling. (T. 1263). Thus, Ortiz put the gun under the bed to hide it from petitioner, should he return to Dumont's apartment.

Ms. Darling also testified that she remembered Ortiz placing the gun under a bed. (T. 1384). There was no testimony about "wiping" the gun "clean." In any event, there is absolutely no indication that this testimony was coerced or false in any way. Without more, this court cannot speculate regarding what petitioner might be attempting to allege in support of his first ground. Thus, notwithstanding petitioner's failure to exhaust his state remedies and a possible avenue to raise this claim in state court, this claim may be dismissed pursuant to 28 U.S.C. § 2254(b)(2).

### B. Right of Appeal Claim

Petitioner alleges that he was unable to submit a *pro se* supplemental brief to the Appellate Division because he was not provided with a copy of his trial transcripts. (Dkt. No. 1, ¶ 12(C)). As stated above, petitioner never raised this claim in any state court and thus, has not exhausted his state court remedies.

---

[4] Although petitioner does not specifically refer to Jennifer Darling as the "witness" about whom he is speaking, there was only one female witness "at the crime scene" who was involved in the placement of the murder weapon under a bed.

Because petitioner has not exhausted his state remedies, this court must again determine whether petitioner has "available" state court remedies by which he could challenge the denial of an extra set of transcripts.  It is unclear whether he would be able to return to state court for consideration of the claim.  Petitioner failed to raise the issue in the Appellate Division, and has already had his one opportunity for appeal to the New York Court of Appeals. *See Grey v. Hoke*, 933 F.2d at 120.  Petitioner cannot return to raise this issue in a section 440.10 motion to vacate his conviction because this issue is not listed in the statute as a claim that would entitle him to have his conviction vacated. N.Y. CRIM. PROC. LAW 440.10(1). *See also Rickman v. McClellan*, 93 Civ. 7744, 1995 U.S. Dist. LEXIS 20479, *29-30 (S.D.N.Y. Oct. 6, 1995)(stating that section 440.10 is not the appropriate vehicle for challenging the denial of transcripts), *adopted by*, 1996 U.S. Dist. LEXIS 2651 (S.D.N.Y. March 6, 1996).  In addition, a section 440.10 motion is filed in the ***trial court***, and there would be no reason for the trial court to rule upon the Appellate Division's denial of transcripts on appeal).

There is, however, a possibility open for petitioner to return to state court.  He could apply for a writ of error coram nobis in the Appellate Division, claiming that their denial of his request for a transcript somehow prejudiced his appeal.  In *People v. Bachert*, 69 N.Y.2d 593, 516 N.Y.S.2d 623, 509 N.E.2d 318 (1987), the New York Court of Appeals held that a writ of error coram nobis in the Appellate Division was the proper method to raise a claim of ineffective assistance of appellate counsel.  In so deciding, the court also stated that a writ of error coram nobis was available when it

14

was asserted that a court-appointed lawyer failed to prosecute an appeal or where the defendant's indigency prevented the perfection of the appeal. *Id.* 69 N.Y.2d at 598, 516 N.Y.S.2d at 626, 509 N.E.2d at 321.  An application for writ of error coram nobis may be made at any time. *Cowan v. Artuz*, 96 F. Supp. 2d 298, 304 (S.D.N.Y. 2000). Thus, it is likely that petitioner could return to state court to file a motion for writ of error coram nobis to raise any constitutional claim in connection with the denial of his extra transcript request.

As with petitioner's first claim, this court finds a review of the transcript shows that notwithstanding the failure to exhaust, this court should exercise its discretion under section 2254(b)(2) and recommend dismissal of this claim on the merits.  The petitioner in *Rickman v. McClellan* made the identical claim regarding his transcripts. As the court stated in *Rickman*, there is no federal constitutional right to appeal a conviction, nor to have a personal copy of the trial transcripts. *Rickman*, 1995 U.S. Dist. LEXIS 20479 at *33 (citing *inter alia Murray v. Giarrantano*, 492 U.S. 1, 17-8 (1989)).  The federal Constitution does require that when a state affords defendant the right to appeal, it cannot discriminate against indigent defendants. *Id.* (citing *inter alia Griffin v. Illinois*, 351 U.S.12, 18 (1956)).

In this case, petitioner actually had two attorneys submit briefs on his behalf, and his second attorney sent petitioner the brief for review and comment ***prior to filing the brief*** with the Appellate Division.  It is clear that counsel had a complete copy of the record, including the transcripts of the nine-day trial. (S.C.R. 10).  The fact that petitioner was not afforded his own copy of the transcripts does not rise to the

15

level of a constitutional violation and a denial of his right to appeal.  The statute governing criminal appeals in New York State provides that an indigent defendant is entitled to one copy of the trial transcripts that will be sent to the defendant or his counsel. N.Y. CRIM. PROC. LAW § 460.70(1).

Petitioner is not claiming that his appellate counsel was ineffective in failing to raise certain issues,[5] he is merely claiming that he was unable to file a *pro se* brief due to the lack of trial transcripts.  A review of his second attorney's brief shows that he made several arguments on petitioner's behalf, and petitioner does not allege that there were any specific claims omitted by appellate counsel that would have changed the appellate court's decision in his case.  Thus, notwithstanding petitioner's failure to exhaust, this court will recommend denying petitioner's transcript claim on the merits pursuant to 28 U.S.C. § 2254(b)(2).

## 3.    <u>Standard of Review</u>

The Antiterrorism and Effective Death Penalty Act of 1996 (AEDPA) provides that a federal court lacks the power to grant a writ of habeas corpus under 28 U.S.C. § 2254 unless the state court ruling **on the merits** of a federal constitutional issue was either "'contrary to ... clearly established Federal law' or 'involved an unreasonable application ... of clearly established Federal law.'" *Noble v. Kelly*, 246 F.3d 93, 98 (2d Cir.)(quoting 28 U.S.C. § 2254(d)(1))(alterations in original), *cert. denied*, 534 U.S. 886 (2001).  The statute further provides that the court may grant a writ of habeas

---

[5] The court notes that if petitioner were claiming ineffective assistance of ***appellate*** counsel he would also have had to raise that claim in the Appellate Division by way of application for a writ of coram nobis. *Bachert, supra.*

corpus when a claim that was considered on the merits by the state court "resulted in a decision that was based on an unreasonable determination of the facts in light of the evidence presented in the State court proceeding." 28 U.S.C. § 2254(d)(2).

In order to apply the AEDPA standard, the federal court must first determine whether the state court decision was "on the merits". 28 U.S.C. § 2254(d)(1). Additionally, the AEDPA provides that a state court's fact findings are presumed correct, unless that presumption is rebutted by clear and convincing evidence. *Id.* § 2254(e)(1). If the State court has failed to adjudicate a claim "on the merits", the pre-AEDPA standard of review applies, and the court reviews both questions of law and mixed questions of law and fact *de novo. Washington v. Shriver*, 255 F.3d 45, 55 (2d Cir. 2001).

A state court's decision is contrary to federal law if it arrives at a conclusion opposite to that reached by the Supreme Court on a question of law or if the state court decides a case differently than the Supreme Court on a set of materially indistinguishable facts. *Williams v. Taylor*, 529 U.S. at 413. A state court unreasonably applies clearly established federal law when the correct principle is identified, but the state court unreasonably applies that principle to the facts of the petitioner's case. *Id.*

## 4.   **Ineffective Assistance of Trial Counsel**

Petitioner's second claim is that his trial counsel was ineffective. Although the petition itself is not clear regarding the specific allegations, petitioner seems to have taken this argument from one of his Appellate Division briefs, and this court has

examined the argument set forth by appellate counsel. Appellant's Supplemental Brief and Appendix at 11-12. The claim seems to focus upon counsel advising petitioner not to testify at trial. Petitioner argues that since he did not testify, his theory that Daniel Ortiz committed these crimes was not properly presented to the jury. Petitioner claims that this error was compounded because he had chosen to forgo the defense of intoxication or lack of capacity prior to trial.

The Appellate Division clearly decided this issue on the merits. The court found that petitioner had received "meaningful" representation, and found that it was petitioner's decision to forgo presenting any proof on intoxication, lack of capacity or lack of culpability. *People v. Coleman*, 296 A.D.2d at 768, 745 N.Y.S.2d at 323. The court also found that defense counsel did not "prevent" petitioner from testifying, and that petitioner himself stated at sentencing that defense counsel "advised him against testifying." *Id.* The Appellate Division held that counsel's advice was a "legitimate strategic decision, given the avenues available to the People for cross-examination of defendant if he testified." *Id.* Because the Appellate Division clearly decided petitioner's constitutional claim on the merits, this court must apply the AEDPA standard.

The well-established Supreme Court precedent provides that to establish ineffective assistance of counsel, a habeas petitioner must show 1) that counsel's representation fell below an objective standard of reasonableness measured by the prevailing professional norms; and 2) that there is a reasonable probability that, but for counsel's unprofessional performance, the outcome of the proceeding would have

been different.  *Bell v. Cone*, 535 U.S. 685, 695 (2002)(citing *Strickland v. Washington*, 466 U.S. 668, 688, 694 (1984)).  *See also Aeid v. Bennett*, 296 F.3d 58, 62-63 (2d Cir. 2002); *Brown v. Artuz*, 124 F.3d 73, 79-80 (2d Cir. 1997); *Rattray v. Brown*, 261 F. Supp. 2d 149, 157 (E.D.N.Y. 2003).[6]

An attorney's conduct is not considered to be objectively unreasonable if the challenged actions or omissions "might be considered sound trial strategy." *Strickland v. Washington*, 466 U.S. at 689; *see also Loliscio v. Goord*, 263 F.3d 178, 192 (2d Cir. 2001)(citing *Strickland*).  Additionally, when measuring counsel's representation, the "court must indulge a strong presumption that counsel's conduct falls within the wide range of reasonable professional assistance[,]" bearing in mind that "[t]here are countless ways to provide effective assistance of counsel in any given case[]" and that "[e]ven the best criminal defense attorneys would not defend a particular client in the same way." *Strickland v. Washington*, 466 U.S. at 689, *quoted in United States v. Aguirre*, 912 F.2d 555, 560 (2d Cir. 1990).

In this case petitioner seems to allege that counsel was ineffective because he advised petitioner not to testify so that petitioner could not properly present testimony supporting his claim that Daniel Ortiz killed Carol Dumont and William Coleman, Jr. Because of this defense, petitioner chose to forgo the defense of intoxication and lack of capacity to commit the crime.  Since he claimed that he did not shoot the victims, his intoxication or extreme emotional disturbance would not have been relevant.

---

[6] In *Williams v. Taylor*, the Supreme Court declared that "the rule set forth in *Strickland* qualifies as 'clearly established Federal law[.]'"  529 U.S. 362, 391 (2000); *see also Sellan v. Kuhlman*, 261 F.3d 303, 309 (2d Cir. 2001).

The issue of petitioner's defenses was discussed **prior to trial**, and petitioner stated on the record that it was his choice not to present any evidence of "mental disease [or] defect testimony." (T. 4).  Counsel specifically stated that he would rather have "tried to utilize some of that, but my client has decided not to." (T. 4).  The court again asked petitioner whether he agreed with counsel's statement, and petitioner said that "[y]es, it was my decision, yes." (T. 4).  Petitioner adamantly maintained, even at his sentencing, that he did not commit the crimes charged, and that Daniel Ortiz was the culprit. (ST 19).  Defense counsel did state, however, that the issue of intoxication was relevant to other aspects of the defense, in terms of petitioner's "knowledge of what happened or what other people did." (T. 6 & 9, 13).  In fact, counsel did question police officers at trial regarding whether petitioner appeared to be intoxicated. (T. 496, 519-20).

Petitioner then claims that given the defense that he did not commit the crime, he should have testified so that he could properly present his theory that Daniel Ortiz committed the crime.  Petitioner claims that his attorney was ineffective in either preventing petitioner from testifying or simply advising him not to testify.  The Appellate Division specifically found that counsel did **not** prevent petitioner from testifying, and the sentencing transcript supports this finding of fact. *People v. Coleman*, 296 A.D.2d at 768, 745 N.Y.S.2d at 323.

At the sentencing hearing, there was a discussion regarding the judge's pre-trial rulings on the admission of certain evidence, petitioner's allegation that his counsel was conspiring to have him convicted, and petitioner's alleged desire to testify.

20

Sentencing Transcript (ST) at 3-6, 11-12, 19)(contained in Record on Appeal Vol. III). Defense counsel made a motion to vacate the verdict based upon *inter alia*, the judge's rulings which would have "precluded my client from taking the witness stand if he had chosen to do that." (ST 3).   The prosecutor commented on petitioner's claim that his attorney "refused to allow him the opportunity to testify." (ST 11).   The prosecutor stated that "[w]e all know that . . . is just a lie, because at the conclusion of the case, prior to the time that the defendant rested, Mr. Coleman was given an opportunity to testify, and then he stated on the record himself that he did not wish to do so." (ST 12).

Later during the sentencing hearing, petitioner stated that "I was advised by my attorney not to testify because of my ex-wife, what my ex-wife was going to say, and there was no record of me ever abusing her at all, so that was hearsay.  So I wanted to testify." (ST 19).   The court notes that counsel's advice that petitioner not take the stand was prompted by the enormous amount of potentially damaging cross-examination that could have taken place if petitioner chose to testify. (ST 3-4).   Prior to trial the judge made *Sandoval*[7] and *Molineux*[8] rulings. (Hearing Transcript (HT) dated August 9, 1999 - included in Vol. 1 of the prosecutor's brief and appendix in the

---

[7] In New York State Courts, a *Sandoval* hearing is held to determine the extent to which a defendant will be subject to impeachment by cross-examination about prior convictions if he testifies.  A defendant's criminal history is considered at this hearing. *See People v. Sandoval*, 34 N.Y.2d 371, 357 N.Y.S.2d 849, 314 N.E.2d 413 (1974); *People v. Dokes*, 79 N.Y.2d 656, 660, 584 N.Y.S.2d 761 (1992).

[8] In a *Molineux* hearing, the court determines whether the prosecution can use a defendant's prior bad acts or crimes to prove an element of the crime for which the defendant is charged. *People v. Molineux*, 168 N.Y. 264, 61 N.E. 286 (1901).

Appellate Division).

In addition to prior convictions, petitioner committed prior bad acts against his ex-wife, Joyce Coleman that did not result in convictions for petitioner. When Ms. Coleman began divorce proceedings against petitioner, he pointed a gun at her head and pulled the trigger. Prosecutor's Brief and Appendix at RA 52. The gun did not discharge because petitioner had loaded it improperly. *Id.* The judge allowed some of the bad acts to be admitted,[9] and the judge ruled that if petitioner took the stand and claimed that he was not the person who committed the crime, the evidence regarding the attempted shooting of Joyce Coleman "could conceivably be permitted."[10] (HT 45). Clearly, petitioner would wish to avoid this testimony.

Thus, defense counsel's advice to petitioner that he not take the stand was not objectively unreasonable and certainly could be viewed as trial strategy. The Appellate Division's decision denying petitioner's claim of ineffective assistance of trial counsel was therefore, not contrary to or an unreasonable application of *Strickland*, and petitioner's claim may be dismissed.

**WHEREFORE**, based on the findings above it is

**RECOMMENDED**, that the petition be **DENIED and DISMISSED.**

Pursuant to 28 U.S.C. § 636(b)(1) and Local Rule 72.1(c), the parties have ten

---

[9] The court would simply note that the *Molineux* proffer was six pages long, and contained forty six separate alleged bad acts, involving fourteen different individuals. Prosecutor's Brief and Appendix at RA 52-58. This court is not reviewing each of the bad acts or the court's ruling in its entirety.

[10] There were other allegations of abuse against Joyce Coleman that the court allowed. Prosecutor's Brief and Appendix at RA 52 & HT 45.

days within which to file written objections to the foregoing report.  Such objections

shall be filed with the Clerk of the Court.  **FAILURE TO OBJECT TO THIS**

**REPORT WITHIN TEN DAYS WILL PRECLUDE APPELLATE REVIEW.**

*Roldan v. Racette*, 984 F.2d 85, 89 (2d Cir. 1993)(citing *Small v. Secretary of Health*

*and Human Services*, 892 F.2d 15 (2d Cir. 1989)); 28 U.S.C. § 636(b)(1); Fed. R. Civ.

P. 6(a), 6(e), 72.

Dated: November 27, 2007

_____

Hon. Gustave J. DiBianco
U.S. Magistrate Judge